UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LINDA JACOBS, WENDY SLAUGHTER,
KENNETH BROWN,

Individually and On Behalf of All Others
Similarly Situated,

                    Plaintiffs,

        -against-

THE NEW YORK FOUNDLING HOSPITAL

                   Defendant.
------------------------------------------------------------X

**MEMORANDUM AND
ORDER**
04-CV-0895 (JMA)

APPEARANCES:

       Jonathan A. Bernstein, Esq.
       Levy Davis & Maher LLP
       880 Third Avenue, 9th Floor
       New York, NY 10022

       David Abrams, Esq.
       305 Broadway, 9th Floor
       New York, NY 10007
       *Attorneys for Plaintiffs*

       Joseph B. Cartafalsa, Esq.
       Alexander Soric, Esq.
       Putney, Twombly, Hall & Hirson, LLP
       521 Fifth Avenue
       New York, NY 10175
       *Attorneys for Defendant*

**AZRACK, United States Magistrate Judge:**

     Plaintiffs are former employees of defendant New York Foundling Hospital ("Foundling"),

who allege, *inter alia*, that they worked overtime without compensation in violation of the Fair

Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, et seq. Plaintiffs claim that Foundling's employees are entitled to overtime pay under the FLSA because (1) Foundling is an enterprise engaged in commerce or, in the alternative, (2) Foundling's individual employees are engaged in commerce. Plaintiffs also assert a state labor law claim, arguing that Foundling employees were not properly compensated for their overtime work as required under New York law.

Plaintiffs commenced this action on March 3, 2004. Plaintiffs moved to certify a collective action and authorize notice to plaintiffs similarly situated on December 13, 2004. I granted the motion to authorize notice to class members on December 23, 2004. Plaintiffs then moved for partial summary judgment on September 15, 2006, and defendant opposed plaintiffs' motion and responded with a cross motion for partial summary judgment on September 19, 2006. The parties primarily dispute whether, as a matter of law, defendant is subject to coverage under the FLSA. They consented to have me preside over this case for all purposes including entry of judgment pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the defendant's summary judgment motion is granted in part and plaintiffs' summary judgment motion is denied in whole.

## I. BACKGROUND

The following facts are taken from the parties' Local Civil Rule 56.1 Statements and the affidavits of William Baccaglini, Jr., Executive Director of Foundling, and are undisputed unless otherwise noted. New York Foundling Hospital is a non-profit organization providing foster care, adoption and family services and related programs to children and families in the New York City area. (Def.'s 56.1 Stmt. ¶ 1.) Plaintiffs in this action are former employees of Foundling who are suing on behalf of themselves and all others similarly situated. Plaintiffs Linda Jacobs and Wendy Slaughter were employed as social workers, and plaintiff Kenneth Brown was employed as a

security escort. (Def.'s Rule 56.1 Stmt. ¶ 4.)[1] All plaintiffs worked in Foundling's Foster Boarding Home program ("Foster Home"); Jacobs also worked at the Boarding Home program ("Boarding Home"). (Def.'s Rule 56.1 Stmt. ¶ 4.) Approximately seventy employees and former employees of Foundling have signed "opt-in" notices in this collective action. (Def.'s Memo. in Supp. of Summ. J. 17 n. 8; Dkt. Nos. 28-46, 49, 50.) Defendants contend that these "opt-in" plaintiffs encompass nineteen different job titles with substantially different duties, and that they are employed in programs that have various geographic locations. (Def.'s Memo. in Supp. of Summ. J. 17 n. 8).

The Commissioner of the New York City Administration for Children's Services ("ACS") is charged with the administration of all child welfare services in New York City, but he may provide these services through an agency such as Foundling in accordance with New York Social Security Law. (Pls.' 56.1 Stmt. Ex. A at 1.) All of the children who are provided services through the Foster Home and Boarding Home programs are referred by ACS, which reimburses Foundling for the cost of services provided to the children placed in its care. (Def.'s 56.1 Stmt. ¶ 17.) In fact, plaintiffs contend that "most of defendant's [programs] are not accessible to the public in absence of a referral by ACS." (Pls.' 56.1 Stmt. ¶ 3.)

Foundling's Foster Home program is a "regular" foster boarding program, designed to care for abused or neglected children without special needs who have been removed from their biological families and placed with foster families. (Aff. of William F. Baccaglini, Jr. taken August 4, 2006 ("Baccaglini Affidavit Aug. 4.") ¶ 8.) This program serves approximately 150 abused or neglected children placed in foster boarding homes in Queens, all of which are private residences maintained by non-employees. (Id.) The Boarding Home program serves abused and neglected children who

---

[1] Plaintiff Jeffrey Jones was dismissed with prejudice on August 28, 2006. (Dkt. No. 72.)

could not be placed in private residences with foster parents.  (Baccaglini Affidavit Aug. 4 ¶ 10.)

These children reside in one of the congregate care boarding homes operated by Foundling.  (Id.)

Neither the Foster Home nor the Boarding Home programs are specifically geared towards caring

for children with severe mental illness.  (Baccaglini Affidavit Aug. 4 ¶ 21.)  These are not "hard-to-

place" programs: a child need not be specifically designated as "hard-to-place" by ACS in order to

participate in these programs.  (Baccaglini Affidavit ¶¶ 11, 21; see also Pls.' 56.1 Stmt. Ex. A at 10.)

The relationship between ACS and Foundling is delineated in a series of contracts which

set forth in detail the scope of the services to be provided by Foundling.  The contracts provide that

"[Foundling] through its executive staff, shall manage its affairs and programs and have the

responsibility for the day-to-day provision of Services to and for each child placed with it in

accordance with this Agreement."  (Pls.' 56.1 Stmt. Ex. A at 16.)  In fact, these contracts explicitly

state that ACS has no direct control over Foundling employees:

> All experts or consultants or employees of [Foundling] who are
> employed by [Foundling] to work under this agreement are neither
> employees of the City nor under contract to the city and [Foundling]
> alone is responsible for the work, direction, compensation and
> personal conduct while engaged under this agreement.

In addition, Foundling can unilaterally terminate its contracts with ACS in whole or in part with

thirty days notice.  (Def.'s 56.1 Stmt. ¶ 8.)

At the same time, however, ACS exercises considerable oversight with respect to the services

offered by Foundling.  For example, Foundling must recruit the number and variety of prospective

foster parents that ACS outlines is necessary for a particular neighborhood.  (Pls.' 56.1 Stmt. Ex.

A at 8.)  In addition, Foundling must accept all children referred to it by ACS, unless Foundling

demonstrates there is a legitimate lack of vacancy in a particular area.  (Id. at 9.)  Foundling must

establish procedures through which recipients of their services may file grievances, and if Foundling decides against the recipients they have a right to appeal this decision directly to ACS. (Id. at 17.) ACS then has the right to make a final decision on the matter. (Id.) ACS has the additional right to review all program activities and duplicate any of Foundling's records as necessary. (Id. at 22.) If Foundling institutes court proceedings to free a child and the Commissioner of ACS does not directly participate, Foundling must keep ACS advised of all developments during the course of the proceedings. (Id. at 13.) Finally, Foundling must advise ACS in advance of the hiring or firing of any chief executive officer, chief fiscal officer, or program director of foster care services and explain the reasons for this decision. (Id. at 16.)

Foundling's funding is almost exclusively derived from federal, state and local reimbursement grants and charitable donations. (Def.'s 56.1 Stmt. ¶ 18.) Foundling was not, however, created by any governmental authority or public agency, nor is it administered by a board responsible to public officials or the general electorate. (Aff. of William F. Baccaglini, Jr. taken August 29, 2006 ("Baccaglini Aff. Aug. 29") ¶ 2.) In fact, Foundling's Board of Directors operates independently of ACS, there is no ACS representative on the Board, and neither ACS nor any other public agency has the power to approve or remove any Board member or executive officer of Foundling. (Def.'s 56.1 Stmt. ¶¶ 16-18.)

## II. DISCUSSION

### 1. Summary Judgment Standard

The standard for granting summary judgment is well established. Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). "[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists," Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994), but "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).

In determining whether any material facts are in dispute, the court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Am. Cas. Co. of Reading, Pa. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994) (quoting Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 572 (2d Cir.1993)); see also Anderson, 477 U.S. at 255. To defeat a properly supported motion for summary judgment, the non-moving party must "'set forth specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998); Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996). The non-moving party must come forth with

"significant probative evidence" demonstrating that a factual dispute does in fact exist. Anderson, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-250 (citations omitted).

2. The Statutory Scheme: Individual and Enterprise Coverage Under the FLSA

Congress' purpose in passing the FLSA as a whole was "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well being of workers.'" Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)). Courts construe the FLSA "liberally to apply to the furthest reaches consistent with congressional direction." Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 296 (1985) (internal quotation marks and citation omitted). In addition, any employer who claims an exemption under the Act has the burden of showing that it applies. 29 C.F.R. § 779.101.

This litigation concerns section 7 of the FLSA, which requires employers subject to the statute to provide their workers with overtime premium pay. 29 U.S.C. § 207(a)(1). Section 7 provides that:

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours unless such employee receives an overtime premium wage.

29 U.S.C. § 207(a)(1). Thus, an employer is subject to the overtime wage provision if either (1) their employee individually was "engaged in commerce" or (2) the employer was an "enterprise engaged in commerce." Id.; see also Bowrin v. Catholic Guardian Society, 417 F. Supp. 2d 449, 457

(S.D.N.Y. 2006), (citing <u>Joles v. Johnson County Youth Serv. Bureau, Inc.</u>, 885 F. Supp. 1169, 1173-74 (S.D. Ind. 1995)).  These two types of coverage are called "individual" and "enterprise" coverage, respectively.  <u>See</u> <u>Bowrin</u>, 417 F. Supp. at 457, (citing <u>Tony & Susan Alamo Found.</u>, 471 U.S. at 295 n. 8).

The FLSA's individual coverage provision provides that any individual employee "engaged in commerce or in the production of goods for commerce" is covered by the Act, regardless of whether his or her employer is an enterprise.  29 U.S.C. § 203(r)(1).  According to the Department of Labor, individual employees are engaged in commerce "when they are performing work involving or related to the movement of persons or things (whether tangibles or intangibles, and including information and intelligence)" between states.  29 C.F.R. § 779.103.  For example, an employee could be engaged in commerce by regularly using the mail or the telephone between states, or traveling across state lines.  <u>Id.</u>; <u>see also</u> <u>Bowrin</u>, 417 F. Supp. 2d at 465.  To determine whether an individual employee is engaged in commerce, courts conduct a fact-specific inquiry into the employment actions of each and every employee asserting a claim under the Act.  <u>See</u> <u>Divins v. Hazeltine Electronics Corp.</u>, 163 F.2d 100, 100 (2d Cir. 1947); <u>Bowrin</u>, 417 F. Supp. 2d at 468-471; <u>Boekemeier v. Fourth Universalist Society in the City of New York</u>, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000).

Enterprise coverage was established after individual coverage, when Congress amended section 7 to include enterprises engaged in commerce, and then specifically delineated what types of employers would be considered enterprises under the statute.  <u>See</u> <u>Tony & Susan Alamo Found.</u>, 471 U.S. at 296; 29 U.S.C. § 203(r)(1).  An "enterprise" is defined under the FLSA as "the related activities performed . . . by any person or persons for a common business purpose."  29 U.S.C. §

203(r)(1).  The statute goes on to deem certain activities to be "performed for a common business purpose." 29 U.S.C. § 209(r)(2).  Activities performed "in connection with the operation of a hospital, an institution primarily engaged in the care of the sick, the mentally ill, or the aged that reside on the premises of the institution," and activities performed "in connection with a public agency" are activities performed for a business purpose.  29 U.S.C. § 203(r)(2).  To summarize, if Foundling constitutes "an enterprise" because it has a business purpose aligned with the above definition, it will be subject to the overtime requirements of the FLSA.

In this case, plaintiffs and defendant disagree on whether Foundling is subject to FLSA overtime requirements under both enterprise and individual coverage theories.  Defendant also claims that plaintiffs' individual coverage claims should be dismissed as to the plaintiff opt-ins in this collective action.  I will first consider whether Foundling is subject to enterprise coverage under the FLSA.  Then I will determine whether Foundling's individual coverage claims should be dismissed as to the plaintiff opt-ins.  Lastly, I will decide whether plaintiffs' state law claims should be dismissed.

3. Defendant's Enterprise Coverage

Plaintiffs claim that Foundling is subject to the FLSA's overtime requirements because Foundling is an enterprise engaged in commerce as defined under the FLSA. With this claim, plaintiffs put forth an argument that has never before been decided by any court.  The parties do not dispute that Foundling is neither an institution primarily engaged in the care of the sick, mentally ill or the aged that reside on the premises, nor an actual municipal public agency. See 29 U.S.C. § 203(r)(2)(A),(C).

On the contrary, plaintiffs argue that Foundling is an enterprise by operation of §

203(r)(2)(C) under which "the activities performed by any person or persons in connection with the activities of a public agency shall be deemed to be activities performed for a business purpose." 29 U.S.C. § 203(r)(2)(C) (emphasis added). Because Foundling is a large social service agency working pursuant to extensive contracts with ACS, plaintiffs contend they are acting "in connection with a public agency." Therefore, they argue, Foundling's activities are performed "for a business purpose," which makes them an enterprise covered under the overtime requirements of the FLSA.[2]

Defendant counters, however, that this interpretation of the statute is incorrect and that a non-profit organization such as Foundling is not covered by the FLSA. Defendant claims that it does not engage in any activities that give rise to enterprise coverage. To buttress their argument, defendant points to cases in which courts construed a separate FLSA provision to find that non-profits similar to Foundling were not covered by the overtime provision. Defendant also looks at the legislative history of the relevant amendments, in which Congress explicitly stated that it only intended to cover government employees.[3]

Again, the disagreement between the plaintiffs and defendant over enterprise coverage comes

---

[2]Plaintiffs ask me to consider a Second Circuit case finding that Foundling's activities were performed "under color of state law" for § 1983 purposes. (Pls.' Memo. in Supp. of Summ. J. 20, (citing Perez v. Sugarman & New York Foundling Hosp., 499 F.2d 761 (2d Cir. 1974)). I agree with defendant that a § 1983 analysis is not applicable here. (See Def.'s Memo. in Opp'n. to Pls.' Summ. J. 21).

[3]Defendant additionally claims that the criteria established by the Supreme Court to determine which entities are "political subdivisions" as defined under the National Labor Relations Act ("NLRA") should inform the test used to define public agencies in this case. (Def.'s Memo. in Opp'n. to Pls.' Summ. J. 14), (citing NLRB v. Natural Gas Util. Dist. of Hawkins County, Tenn., 402 U.S. 600 (1971)). I find this argument unavailing. First, the plaintiffs are not asserting that Foundling is an actual public agency under the FLSA, but that it is acting "in connection with" that agency. Second, such an analogy is unnecessary because the statutory text of the FLSA already delineates what types of employers are public agencies, as I will later discuss. See infra, Part II.3.B.

down to a difference in interpretation of § 203(r)(2)(C) of the FLSA. Because there are no other

cases on point, I must interpret the statute by looking at its text in full, the phrase at issue in the

context of the larger statute, its legislative history, and cases that analyze the FLSA's application

to non-profit entities.

A. Text of Statute

When interpreting the meaning of a statute, the analysis begins with the statutory language.

In re Edelman, 295 F.3d 171, 177 (2d Cir. 2002). In this case, § 203(r)(2) provides that activities

performed for a business purpose are:

> [T]he activities performed by any person or persons
> - (A) in connection with the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution . . . (regardless of whether or not such hospital, institution, or school is operated for profit or not for profit), or
> - (B) in connection with the operation of a street, suburban or interurban electric railway, or local trolley or motorbus carrier . . . (regardless of whether or not such railway or carrier is public or private or operated for profit or not for profit), or
> - (C) in connection with the activities of a public agency . . . .

29 U.S.C. § 203(r)(2). Plaintiffs correctly point out that Congress passed § 203(r)(2)(C) without

including any definition of the "in connection with" language. (Pls.' Memo in Supp. of Summ. J.

17). Plaintiffs therefore ask that the statute be given its "plain language" meaning. Plaintiffs argue

that the plain meaning of § 203(r)(2)(C) conveys that any non-profit that acts in connection with a

public agency is an enterprise, and is therefore subject to overtime requirements. (Pls.' Memo in

Supp. of Summ. J. 16-17.)

Looking at the text of the statute, however, I conclude that the plain language is ambiguous

as to whether it covers employees working in conjunction with a public agency, as argued by

plaintiff. On one hand, if Congress wanted to include only employees working within a public agency, it could have simply stated that "all persons working within a public agency" are covered, which would rule out employees working in connection with such agencies. See Chisom v. Roemer, 501 U.S. 380, 396 (1991) (finding that "if Congress had such an intent, Congress would have made it explicit in the statute"); Zadvydas v. Davis, 533 U.S. 678, 697 (2001) (noting that a statute was ambiguous, and if Congress had meant to include a phrase it could have spoken in clearer terms.) On the other hand, the "in connection with" language of §§ 203(r)(2)(A)(B) and (C) implies coverage of employees working <u>within</u> these organizations- namely, hospitals, urban carriers and public agencies- and not those working <u>in connection</u> with these organizations. Because I find that the language of the statute is ambiguous, I am left to resolve that ambiguity. The broader context of the statute can provide assistance in this regard.

B. <u>Statutory Context</u>

It is a well-known canon of statutory interpretation that the words of a statute should be interpreted in the context and in consideration of its place in the overall statutory scheme. See <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 132-33 (2000). Looking at § 203(r)(2) as a whole, it is clear that Congress specified certain non-profits to be covered under the statute: those listed in § 203(r)(2)(A). Subsection (A) lists hospitals and institutions "primarily engaged in the care of the sick, the aged, the mentally ill or the defective who reside on the premises of such an institution . . . regardless of whether or not such hospital [or] institution . . . is operated for profit or not for profit." 29 U.S.C. § 203(r)(2)(A). In contrast, there is no "regardless of" language in § 203(r)(2)(C). By including the "regardless of" language in § 203(r)(2)(A), Congress intended to subject these types of institutions, whether they were non-profit or not, to coverage under the Act. The absence of this "regardless of" language in 203(r)(2)(C), however, implies that Congress did

not intend to extend public agency coverage to persons working in non-profits.

Other sections of the statute similarly support this inference. For example, section 203(x) defines a "public agency" as: "the government of the United States, the government of a State or political subdivision thereof; any agency of the United States (including the United States Postal Service and Postal Rate Commission), a State or a political subdivision of a State; or any interstate governmental agency." 29 U.S.C. § 203(x). The statute later painstakingly details what constitutes "an individual employed by a public agency," but never refers to an employee of an entity acting "in connection with a public agency." See 29 U.S.C. § 203(e)(2). Plaintiffs emphasize that they are not claiming that Foundling is a public agency, but only that it is acting "in connection with" a public agency. However, the absence from these provisions of any language indicating that non-profits working in connection with a public agency are covered simply strengthens defendant's argument that it was not Congress' intention to include these types of organizations.

This conclusion is consistent with the United States Department of Labor's approach. The Labor Department Wage and Hour Division is the primary federal authority that determines the FLSA's scope. Its interpretations, "while not controlling upon the courts by reason of their authority, do constitute a body of experienced and informed judgment to which the courts and litigants may properly resort for guidance." Bowrin, 417 F. Supp. 2d at 463-64, (citing Reich v. Miss Paula's Day Care Ctr., Inc. 37 F.3d 1191, 1194 (6th Cir. 1994)). According to an opinion letter issued by the Wage and Hour Division, "[t]he enterprise provision of the FLSA generally does not cover a private non-profit institution providing care for . . . neglected children unless that institution is operated as a hospital, an institution primarily engaged in the care of the sick, the aged or the mentally ill or defective who reside on the premises of such institution." U.S. Dep't of Labor, Wage and Hour Division, Opinion Letter No. FLSA2005-8NA of Sept. 2, 2005, available at

http://www.dol.gov/esa/whd/opinion/FLSANA/2005/2005_09_02_8NA_FLSA.pdf ("Opinion Letter") at 1, (cited with approval in <u>Bowrin</u>, 417 F. Supp. 2d at 463). In fact, the letter specifies that coverage does not typically extend to non-profits where their activities are not in substantial competition with other for-profit businesses. Opinion Letter at 1. In sum, the construction of this section of the FLSA as a whole, as well as the agency interpretation of these provisions, supports the defendant's conclusion that non-profits such as Foundling are not subject to overtime requirements of the FLSA.

C. <u>Legislative History</u>

Plaintiffs' interpretation of § 203(r)(2)(C) implies that in amending the FLSA, Congress intended to extend enterprise coverage under the Act to all non-profit organizations that act "in connection with" public agencies. However, there is no language in the legislative history that suggests such an intention.

Section 203(r)(2)(C), yielding the "in connection with a public agency" language, was added in 1974 as an amendment to the FLSA. The legislative history makes clear that Congress' objective in passing the amendment was to extend minimum wage and overtime coverage under the Act to federal, state and local employees. Subcommittee on Labor of the Committee on Labor and Public Welfare, 94th Congress, <u>Legislative History of the Fair Labor Standards Amendments of 1974</u>, at 2 (Comm. Print 1976). This very specific objective was stated repeatedly by Senators and Representatives throughout the debates in both the House and Senate. <u>Legislative History of the Fair Labor Standards Amendments of 1974</u>, at 2, 60, 121, 130, 140-41, 146-47, 226, 258, 309, 313, 479, 503-04, 1677.

A review of the extensive legislative history of this amendment reveals no mention of an intent to extend enterprise coverage to non-profits that act in conjunction with federal, state and local

government agencies. In fact, the legislative history suggests the opposite: that the extension of coverage was intended to be narrow, rather than broad. The cost of expanding coverage just to government employees was controversial, and the implications of this were discussed at length. Legislative History of the Fair Labor Amendments of 1974, at 27, 146, 309-10, 358-61. For example, before debate on the bill began, the Department of Labor evaluated the fiscal feasability of extending coverage to municipal governments. Id. at 27, 146. The Department of Labor report found that because most municipal employees across the country already received overtime coverage from their employers, the expansion of coverage to municipal employees would put little strain on municipal budgets. Id.

In contrast, the legislative history of the section that designates which non-profits are explicitly covered under the FLSA offers further evidence that non-profits such as Foundling were not intended to be covered under the Act. As previously discussed, § 203(r)(2)(A), passed as an amendment in 1966, specifies that non-profit hospitals and institutions primarily engaged in the care of the sick, the aged or the mentally ill who reside on the premises are covered under the FLSA. The legislative history regarding this provision indicates that these types of non-profits were chosen for inclusion because they were in substantial competition with similar activities carried on by enterprises organized for a business purpose. Sen. Rep. No. 89-1487 (1966), reprinted in 1966 U.S.C.C.A.N. 3010. Congress concluded that the failure to cover these non-profits under the Act would undermine one of the basic purposes of the law: the elimination of conditions that constitute an unfair method of competition in commerce. Id. In sum, Congress clearly chose to include these types of non-profits for a specific reason, and did not include non-profits similar to Foundling.

Because there is no legislative history to support plaintiffs' theory, I do not find that Congress inserted the "in connection with" language to apply the FLSA to non-profits such as

15

Foundling. See Chisom v. Roemer, 501 U.S. 380, 396 (1991) (finding that if Congress had a particular intent, "at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history.")  In fact, the pertinent legislative history in this case suggests the opposite: that Congress' intention was to extend coverage to municipal workers in very specific types of non-profit entities.  This conclusion is also supported by case law which unequivocally finds that non-profits similar to Foundling are not covered under the FLSA.

D. Case Law

Although the "in connection with a public agency" language of § 203(r)(2)(C) has never been construed by any court, there are cases which evaluate whether non-profits are enterprises pursuant to the other subdivisions in § 203(r)(2).  For example, in Bowrin v. Catholic Guardian Society,  a court in this circuit considered whether a non-profit similar to Foundling was required to observe FLSA overtime requirements.  417 F. Supp. 2d 449, 449 (S.D.N.Y. 2006).  There, employees of Catholic Guardian Society ("CGS") claimed that CGS as a whole was an "enterprise engaged in commerce" pursuant to § 203(r)(2)(A), because it was primarily engaged in the provision of residential care to the mentally ill.  Bowrin, 417 F. Supp. 2d at 459-60.

CGS operated two types of residential foster care group homes: three "regular" group homes, and four "hard-to-place" homes.  Id. at 454.  The regular group homes were designated for children who could not function in a family setting and required structured behavior modification.  Id. at 454.  The "hard-to-place" homes, called Assertive Community Treatment ("ACT") homes, were "specifically geared to care for children with severe mental illness."  Id. at 455.  A child's mental health status was a significant factor in his or her referral to the ACT program, and these homes employed additional clinical staff to monitor the residents' mental health status.  Id. at 454, 462-63.

The Bowrin Court found that the ACT homes were "primarily engaged" in providing

residential care to the mentally ill residing on the premises, and thus were enterprises under the FLSA. Bowrin, 417 F. Supp. 2d at 460-64. Conversely, the Court found that "all services other than [the ACT] programs are not performed for a statutorily recognized business purpose" and are therefore not enterprises under the Act. Bowrin, 417 F. Supp. 2d at 465. Furthermore, the Court rejected plaintiffs' argument that CGS as a whole was an enterprise by virtue of the fact that the ACT program comprised more than half of the overall budget of CGS. Id. at 464-65. Foundling's programs, which include providing foster care, adoption and family services to "regular" children, are substantially similar to the CGS programs that were deemed to fall outside of the FLSA's scope in Bowrin. Moreover, Foundling does not provide residential care to "hard-to-place" or mentally ill children, which are the types of programs the Bowrin Court found were covered under the statute. This further convinces me that Foundling's programs are not subject to the overtime requirements of the statute.

Indeed, other district courts have made similar distinctions. In Joles, the court also held that an employee of a non-profit that had similar characteristics to Foundling was not covered by § 203(r)(2). See Joles v. Johnson County Youth Service Bureau, Inc., 885 F. Supp. 1169, 1175 (S.D. Ind. 1995). In Joles, the defendant Johnson County Youth Service Bureau ("Youth Service Bureau") operated a non-profit group home for troubled youths who were referred by juvenile courts or local agencies, including the county welfare and probation departments. Joles, 885 F. Supp. at 1173. The Youth Service Bureau received *per diem* payments from the county and from public agencies, and private contributions. Id. at 1173. However, the Joles Court noted that "unless it engages in commercial activities in competition with private entrepreneurs or qualifies as one of the organization [sic] listed in 29 U.S.C. § 203(r)(2), a non-profit charitable organization is not an 'enterprise' under § 203(r) because it is not conducted for a 'business purpose.'" Id. at 1175. The

Court explicitly noted that because the defendant did not qualify as any of the organizations or activities listed in 203(r)(2), it was not covered under the FLSA.  Id.

Foundling, like the Youth Services Bureau, obtains client referrals from a municipal agency, and receives substantial funding from municipal sources.  Yet the Joles Court held that the Bureau was not liable for overtime payments under the Act because the Youth Services Bureau was not the type of non-profit that is covered under § 203(r)(2).  The same is true here.

Concededly, plaintiffs correctly point out that both Bowrin and Joles interpreted § 203(r)(2)(A), a different provision than § 203(r)(2)(C), which is at issue in the present case.  Both courts, however, held that these non-profits were not covered by § 203(r)(2) more generally.  See Bowrin, 417 F. Supp. 2d at 458 (citing § 203(r)(2) in its entirety before it came to a decision); Joles, 885 F. Supp. at 1175 (same).  I give substantial credence to the logic behind these thoughtful decisions and their explanations concerning which programs are and are not covered under the FLSA.  Both cases examined non-profits with characteristics very similar to Foundling, and concluded that the employees of these programs were not covered under the statute.  Thus, I believe the case law supports my decision that Foundling is not covered under the FLSA.[4]

Although plaintiffs have proffered a unique argument which seeks to extend enterprise coverage to a sympathetic plaintiff class, the text of the statute, its legislative history, and relevant case law does not support this extension.  Extending FLSA overtime requirements to all non-profits that act in conjunction with city and state agencies would have serious financial or economic

---

[4] Had I found that Foundling was an "enterprise" under the statute, I would next inquire whether the organization was "engaged in commerce" as defined. 29 U.S.C. § 203(s)(1)(B). Because I hold that the defendant is not an enterprise, I will not address this second issue.

repercussions for a multitude of non-profits, and I am not convinced that Congress intended this result. Until Congress speaks by amending the statute, I cannot find that non-profit entities such as Foundling are subject to the FLSA, regardless of their extensive connection with municipal public agencies. In sum, plaintiffs' enterprise coverage claim is dismissed, and defendant's summary judgment motion is granted in part.

4. Plaintiffs' Collective Action

Despite the determination that Foundling is not an enterprise engaged in commerce, plaintiffs' individual coverage claim, which is framed as a collective action, remains. Plaintiffs argue that regardless of whether Foundling is an enterprise, Foundling's individual employees are engaged in commerce or in the production of goods for commerce, and thus Foundling is subject to FLSA overtime requirements. The parties do not dispute that plaintiffs were not "engaged in the production of goods for commerce." Thus, at issue here is whether the plaintiffs were "engaged in commerce." See 29 U.S.C. § 206(a).

Defendant, however, moves to dismiss plaintiffs' individual coverage claims as to the opt-in plaintiffs in the collective action. Defendant contends that because an individual coverage inquiry "by its very definition and nature requires an analysis of each employee's specific job duties," a collective action is "not appropriate and cannot be maintained for claims alleging individual coverage of employees." (Def.'s Memo. in Supp. of Summ. J. 17). Foundling argues that the number and varying job descriptions of the employees in this case would make this type of analysis impossible.

Under the FLSA's individual coverage provision, any employee "engaged in commerce" is covered by the Act, regardless of whether his or her employer is an enterprise engaged in commerce.

A determination of whether an individual employee is engaged in commerce is a fact-specific inquiry into the employment activities of each and every employee asserting a claim under the Act. See Divins v. Hazeltine Electronics Corp., 163 F.2d 100, 100 (2d Cir. 1947); Bowrin, 417 F. Supp. 2d at 468-71; Boekemeier v. Fourth Universalist Society in the City of New York, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000).

Defendant argues that this type of fact-specific inquiry is impossible as a collective action, and cites several cases in which an FLSA collective action was decertified because the case required a detailed factual analysis of each employee's job duties. (Def.'s Memo. in Supp. of Summ. J. 17) (citing Mike v. Safeco Ins. Co. of America, 274 F. Supp. 2d 216 (D. Conn. 2003); Diaz v. Electronics Boutique of America, Inc., 04-CV-840, 2005 U.S. Dist. LEXIS 30382, at *11-12 (W.D.N.Y. Oct. 13, 2005); Dean v. Priceline.com, Inc., 00-CV-1273, 2001 U.S. Dist. LEXIS 24982, at *7 (D. Conn. June 5, 2001)). I do not, however, find their authority controlling. The above cases determined whether individual employees were "similarly situated" for collective action purposes and whether specific employees were covered under the administrative or executive exception to the FLSA's overtime requirements. In contrast, in this case I must inquire into whether each plaintiff is individually engaged in commerce.

I found no authority precluding a finding that individual coverage may be decided in a collective action. Indeed, despite defendant's claim that a collective action would be impossible here, there are also cases which do allow for a collective action regardless of the need for a detailed factual analysis. Ayers v. SGS Control Services, Inc., 03-CV-9077, 2007 WL 646326, at *5 (S.D.N.Y. Feb. 27, 2007), (citing Wilks v. Pep Boys, 02-CV-0837, 2006 WL 2821700, at *5-6 (M.D. Tenn. Sept. 26, 2006)); Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000); Scott

v. Aetna Services, Inc., 210 F.R.D. 261, 264-66 (D. Conn. 2002) (citations omitted).  Because too little discovery has been done to determine whether this inquiry will be impossible,  I cannot find as a matter of law that a collective action should be barred here.  I therefore do not dismiss plaintiff opt-ins' individual coverage claims on these grounds.

Defendant also argues, in the alternative, that the individual coverage claims should be dismissed as to the plaintiff opt-ins because the opt-ins are not "similarly situated" to the plaintiffs or each other as is required for a collective action.  The similarly situated requirement for a collective action derives from § 216(b) of the FLSA, which provides for a representative right of action to recover unpaid overtime compensation from employers who violate the Act.  29 U.S.C. § 216(b).  Section 216(b) provides:

> An action to recover the liability prescribed in either of the preceding sentences may be maintained . . . in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Id.  Thus, under the FLSA, potential plaintiffs must "opt in" to a collective action to be bound by the judgment.  In order to opt-in, plaintiffs must be similarly situated.  See 29 U.S.C. § 216(b).  However, neither the FLSA nor its implementing regulations define similarly situated.

Courts follow a two-step process when determining whether a matter should proceed as collective action.  The Court first looks at the pleadings and affidavits to determine whether the class members are similarly situated.  Lee v. ABC Carpet & Home, 236 F.R.D. 193, 197 (S.D.N.Y. 2006) (citing Scholtisek v. Eldre Corp., 229 F.R.D. 381 (W.D.N.Y. 2005)).  If the plaintiff meets a minimal burden of showing that they are similarly situated, the court certifies the class.  Potential class

members are then notified and given the chance to opt in to the action.  Lee, 236 F.R.D. at 197.  The second phase of the inquiry occurs after discovery and is typically precipitated by a motion for decertification by the defendant.  Id.  If the opt-in plaintiffs are similarly situated, the collective action proceeds to trial; if they are not, the class is decertified and the class representative proceeds on his own.  Id.

When the case is in its later stages, as is true here, a more heightened scrutiny is applied to the similarly situated question than if it is in pre-discovery.  Torres v. Gristede's Operating Corp., 04-CV-3316, 2006 WL 2819730, at *9 (S.D.N.Y. Sept. 29, 2006).  As the court in Torres v. Gristede's Operating Corp. aptly noted, "[t]he Second Circuit has not yet determined which standard applies in considering whether class members are 'similarly situated,' and the great majority of cases involve certification at the initial stages of litigation"  Torres, 2006 WL 2819730, at *9; see also Rodolico v. Unisys Corp., 199 F.R.D. 468, 481 (E.D.N.Y. 2001) ("This Court has not discovered a well settled test, standard or rule for determining whether plaintiffs are similarly situated so that they should be permitted to maintain a collective action.")  The Torres Court therefore looked to other districts and circuits for guidance in developing their analysis.  Torres, 2006 WL 2819730, at *9.

The Torres Court chose to adopt the Tenth Circuit's approach to determining whether class members are similarly situated, what the Court called the "ad hoc approach."  Id.  Under this method, a court reviews several factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations."  Id., (citing Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001)); see also Rodolico, 199

F.R.D. at 482 (applying the same four factors). The Torres Court also noted that in deciding whether to allow a collective action, courts examine whether the employees suffered injury because of a common policy or practice of the employer. Torres, 2006 WL 2819730, at *10, (citing Scholtisek, 229 F.R.D. at 390); see also Ayers, 2004 WL 2978296, at *4.

At this point in the litigation, I cannot determine that there is no issue of material fact in dispute as to whether plaintiffs are similarly situated. The present record discloses few details as to whether the plaintiffs are similarly situated, and because of the focus on plaintiffs' enterprise coverage claims, there has been little to no discovery on the plaintiffs' individual coverage claims. Although the defendants urge that the plaintiff employees' responsibilities are far too variant for them to be similarly situated, the record is not sufficiently complete to make such a determination. In addition, plaintiffs have asserted that all of these employees suffered under a common policy or practice at Foundling. After further discovery, I will certainly consider this and other factors in determining whether the plaintiffs are similarly situated. Without discovery on the issue, however, I do not find that the various job descriptions of the plaintiffs render these plaintiffs *per se* dissimilar. If, at a later point in the litigation, I find that this is so, I will have the discretion to create subclasses or to dismantle the collective action. See Rodolico v. Unisys Corp., 199 F.R.D. at 484. Accordingly, because a genuine issue of material fact remains as to whether the plaintiffs are similarly situated, I will not dismiss the opt-in plaintiffs' individual coverage claims at this time.

5. Plaintiffs' Labor Law Claims

Plaintiffs' state labor law claims are limited to one claim alleging that Foundling's policy caused employees to unlawfully forfeit accrued compensatory time. More specifically, plaintiffs claim that pursuant to Foundling's overtime policy, any compensatory time earned was forfeited if not used within 90 days of accrual, and that employees were therefore not properly compensated for

their overtime work as required by law. Plaintiffs' evidence is limited to affidavits from three of the four named plaintiffs stating simply that "[u]pon information and belief, some of my accrued comp time was forfeited because I was unable to use it within the requisite period." (Pls.' Memo. in Opp'n to D.'s Summ. J. 5.) Defendant, for its part, argues that this pleading is deficient. Plaintiffs counter that the pleading is sufficient and that in the alternative, any deficiency could easily be cured by amending their complaint. (Pls.' Memo. in Opp'n to D.'s Summ. J. 5.)

I agree that this pleading is insufficient to prove plaintiffs' claims. See Mascol v. E & L Transp., Inc., 387 F. Supp. 2d 87, 93 (E.D.N.Y. 2005) (finding that "[a]n employee who sues for unpaid overtime must prove that the employer has not compensated the employee for work performed," and using extensive payroll records as evidence) (citing Grochowski v. Pheonix, 318 F.3d 80, 87-88 (2d Cir. 2003).) I find, however, that the plaintiffs should be allowed to amend their complaint. A motion to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which states that leave to amend "shall be freely given when justice so requires." Federal Rule of Civil Procedure 15(a). Courts have broad discretion in deciding whether to give a plaintiff leave to amend their complaint. See Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000) ("Leave to amend shall be freely given, and this court reviews the district court's actions for abuse of discretion.") (citations omitted). As previously stated, little discovery has been conducted on any claim other than plaintiffs' enterprise coverage claim under the FLSA, which today is dismissed by this court. Thus, plaintiffs should be allowed to fully pursue their remaining claims in one case before this court. I will therefore dismiss plaintiffs' state labor law claims without prejudice with leave to amend the complaint to include a proper pleading.

### III. CONCLUSION

Based on the text of the FLSA, its legislative history, and the relevant case law, I find that defendant Foundling is not an "enterprise engaged in commerce" as defined by the FLSA. Therefore, plaintiffs' enterprise coverage claims are dismissed. Plaintiffs may, however, continue with their individual coverage claims as a collective action. Plaintiffs' state labor law claims are dismissed without prejudice, but with leave to amend their complaint in order to include a proper pleading on this claim. Accordingly, I grant defendant's motion for summary judgment in part and deny plaintiffs' motion for summary judgment in whole.

SO ORDERED.

Dated: April 16, 2007
      Brooklyn, New York

                                          _____/s/_____
                                          Joan M. Azrack
                                          United States Magistrate Judge